In re Theodore Carlton RICHARDSON,
Debtor.

OLD REPUBLIC SURETY
CO., Plaintiff,

v.

Theodore Carlton RICHARDSON,
Defendant.

Bankruptcy No. 94–00324.
Adv. No. 94–10088.

United States Bankruptcy Court,
District of Columbia.

Feb. 16, 1995.

Robert F. Carney, Whiteford, Taylor & Preston, Baltimore, MD, for plaintiff.

Theodore Carlton Richardson, pro se.

*DECISION ON CROSS MOTIONS*
*FOR SUMMARY JUDGMENT*

S. MARTIN TEEL, Jr., Bankruptcy Judge.

Under the court's consideration are cross motions for summary judgment on the plaintiff's nondischargeability complaint. For reasons explained below, the plaintiff's motion for summary judgment will be granted.

*BACKGROUND FACTS*

The plaintiff, Old Republic Surety Company, as surety on behalf of the defendant-debtor, Theodore C. Richardson, a defaulting fiduciary, paid $59,215.50 to a judicially created trust estate to cover the debtor's default. The plaintiff holds a judgment in the amount of the payment, plus post-judgment interest, and seeks a determination here that the plaintiff is subrogated to the rights of the creditor trust estate and thus may object to dischargeability under § 523(a)(4) based on the debtor's alleged defalcation.[1]

There were three entities involved in this matter—the debtor, the plaintiff, and the beneficiaries of the trust account. The debtor, as a court-appointed trustee, was authorized by the Superior Court of the District of Columbia to sell certain property and place the proceeds in a trust account for distribution to the beneficiaries. Pursuant to a related court order, the debtor secured two surety bonds from the plaintiff conditioned on the debtor's compliance with his obligations as a trustee. Subsequent to the sale of the property, the Superior Court ordered the debtor to turn over $59,215.50 to the trust account— the proceeds from the sale after reimbursement for disallowed compensation and administrative expenses, together with lost interest. The debtor failed to turn over the funds to the trust account and a judgment was entered by the court against the debtor, as a defaulting fiduciary, and against the plaintiff, as surety for the debtor. The plain-

tiff satisfied the judgment on behalf of the debtor by paying the $59,215.50 into the trust account and on January 21, 1994, received a corresponding judgment against the debtor for $59,215.50 with interest running from the date of the judgment. The debtor filed a chapter 7 petition on April 1, 1994.

The first question the court must answer is whether the plaintiff, as surety, is subrogated to the rights of the beneficiaries of the trust account, as creditor, and thus entitled to benefit from whatever right of nondischargeability the creditor had under § 523(a)(4). The court concludes the plaintiff is so entitled.[2] The second question the court must resolve is whether the debt owed the trust account was of a nondischargeable character under § 523(a)(4). The court concludes that it was and hence, that the plaintiff's claim is nondischargeable.

*DISCUSSION*

A. *Summary Judgment*

The standard for summary judgment under F.R.Civ.P. 56, incorporated into F.R.Bankr.P. 7056, is for the movant to show that based on the pleadings "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Once the movant makes a properly supported motion, the burden shifts to the nonmovant to demonstrate the existence of a genuine dispute. Under Rule 56(e),

> an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The nonmovant's evidence must be viewed in a light most favorable to the nonmovant's position. *Matsushita Electric Industrial*

---

1. The plaintiff has also alleged a right to nondischargeability under § 523(a)(2)(A) which requires a showing of "false pretense, a false representation, or actual fraud, other than a statement respecting the debtor's financial condition." However, the parties' motions for summary judgment are based solely on § 523(a)(4).

2. The court already ruled in connection with a non-dispositive motion in this matter that the plaintiff "is subrogated to the rights of the creditors [the trust account] it paid to object to the dischargeability of the debt owed by the Debtor to those creditors. . . ." Order of Sept. 27, 1994. The court reaffirms this prior ruling.

*Co., Inc. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Subrogation

The first question of subrogation requires two levels of analysis. First, is the plaintiff, as a surety, subrogated to the rights of the trust beneficiaries, as creditor? Second, if so subrogated, is the plaintiff entitled to exercise the creditor's alleged right to nondischargeability?

#### 1. Section 509

■ Subrogation is addressed under § 509 of the Code, which indicates that the plaintiff would be subrogated to the rights of the creditor. Section 509 provides that

> an entity that is liable with the debtor on, or has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

In addition to the explicit requirements under § 509(a), "it is well settled that the alleged subrogee must not have acted as a volunteer in making the payment and the debt paid must be one for which the alleged subrogee was not primarily liable. *In re Bugos*, 760 F.2d 731, 734 (7th Cir.1984); *In re Smothers*, 60 B.R. 733, 735 (Bankr. W.D.Ky.1986); *In re Lapille*, 53 B.R. 359, 361 (Bankr.S.D.Ohio 1985)." *In re Rose*, 139 B.R. 878, 882 (Bankr.W.D.Tenn.1992). The subrogee also may be disqualified from asserting subrogation rights if exceptions under § 509(b) or (c) apply. The exceptions under § 509(b) provide that the subrogee will not be entitled to assert those rights if the original claimant's claim for reimbursement or contribution against the debtor is allowed under § 502, disallowed under § 502(e), subordinated under § 510, or if the subrogee received the consideration for the original claimant's claim. The purpose of these exceptions under § 509(b) is to prevent the subrogee from collecting a double recovery; the subrogee must choose whether to proceed under its own rights or under the rights of the prior creditor. *See* Lawrence P. King, 3 Collier on Bankruptcy 509.03, at 509–9 (15th ed. 1994). The exception under § 509(c) provides that the subrogated claim

is subordinated until the original claimant is paid in full.

■ The plain language of § 509(a) dictates that a party that pays a claim on which it is liable with the debtor is subrogated to the rights of the creditor on that claim. Similarly, the plaintiff in this case, as surety, was liable with the debtor on the trust account claim and having satisfied that claim, is subrogated to the rights of the trust beneficiaries. There is no evidence suggesting that any of the exceptions to subrogation apply. The plaintiff did not pay the trust beneficiaries voluntarily. Rather, the plaintiff paid per an order of the court. Similarly, the plaintiff was not primarily liable on the debt. The debt arose pursuant to a surety agreement with the debtor, who incurred the debt as a result of actions he took as a court appointed trustee. Furthermore, none of the evidence suggests that the plaintiff has a claim for reimbursement or contribution under § 509(b) that has been allowed under § 502, disallowed other than under § 502(e), or subordinated under § 510. The plaintiff has chosen to pursue its claim under the rights of the trust beneficiaries. Finally, it is undisputed that the plaintiff paid the trust beneficiaries in full on their claim.

Section 509(a) most commonly applies in the analogous situation where a surety pays a debtor's tax debt and then seeks subrogation to the tax authority's right of nondischargeability. Courts faced with this situation similarly hold that sureties are subrogated to the rights of the creditor tax authority under § 509. *See In re Rose*, 139 B.R. at 881–82 (surety satisfying debtor's tax obligation subrogated to rights of tax authority under § 509(a)); *In re Norris*, 107 B.R. 592, 594–96 (Bankr.E.D.Tenn.1989) (surety subrogated to nondischargeability of state tax authority); *In re Woerner*, 19 B.R. 708, 711 (Bankr.D.Kan.1982).

Accordingly, the court concludes that the plaintiff is subrogated, as a surety, to the rights of the creditors in this case.

#### 2. Subrogated Rights

■ Having concluded that the plaintiff is subrogated to the rights of the trust beneficiaries, the court must next determine

whether the plaintiff may exercise the trust beneficiaries' right of nondischargeability under § 523(a)(4), if such a right is found to exist. The debtor contends that even if subrogated to the rights of the creditor, the plaintiff may not exercise the creditor's right to nondischargeability under § 523(a)(4). The debtor argues that the plaintiff can not demonstrate the necessary fiduciary relationship between the debtor and the plaintiff in order to object to discharge of its debt under § 523(a)(4).

■ The debtor appears to miss the essence of subrogation. The general rule of subrogation is that the subrogee stands in the shoes of the prior claim holder, and as such, "is substituted to all rights and remedies" of the prior claim holder as though the subrogee *were* the prior claim holder. Black's Law Dictionary 1595 (4th ed. 1968). Accordingly, whether the plaintiff had a fiduciary relationship with the debtor is irrelevant. Rather, the analysis should focus on whether the prior claim holders, the trust beneficiaries, had a fiduciary relationship with the debtor. Standing in the shoes of the trust beneficiaries, the plaintiff would be entitled to all the rights and remedies against the debtor that the trust beneficiaries could have asserted. *See In re Norris,* 107 B.R. at 593 (surety subrogated to all rights of the state despite not being owed taxes as the state, not being the victim of debtor's embezzlement, and not having fiduciary relationship with debtor).

That the subrogee may assert the creditor's right to nondischargeability under § 523(a)(4) is supported by the case law addressing this issue. *See In re Snellgrove,* 15 B.R. 149 (Bankr.S.D.Fla.1981) (debtor's debt to surety nondischargeable under § 523(a)(4) to the extent of debtor's embezzlement of creditor's funds). Courts hold similarly when sureties assert the nondischargeability rights of a tax authority under § 523(a)(1). *See In re Fields,* 926 F.2d 501, 504 n. 8 (5th Cir.) ("having paid Debtor's taxes to the TABC, [the surety] is subrogated to all the rights that the State of Texas had against Debtor under the Bankruptcy Code"), *cert. denied,* 502 U.S. 938, 112 S.Ct. 371, 116 L.Ed.2d 323 (1991); *In re Norris,* 107 B.R.

at 596 (surety claim against debtor subrogated to tax authority's nondischargeability right under § 523(a)(1)) and cases cited therein. As summarized by the court in *Norris,* the courts reason that

> [a] debtor who fails to pay taxes before bankruptcy usually bears the burden of that failure after bankruptcy by being liable for a nondischargeable tax debt. However, if the debt to the surety is dischargeable, then the debtor can choose not to pay taxes with the knowledge that he can escape liability by filing bankruptcy and discharging the surety's claim....
>
> A debtor's fresh start is not overburdened by excepting a surety's subrogation claim from the discharge. The debtor's fresh start is the same; he owes the same amount of nondischargeable tax debt; the only difference is whether the debtor owes the debt to the government or the surety.

*Id.*

Similarly, the debtor in this case would be responsible after bankruptcy for a nondischargeable claim under § 523(a)(4). The public policy behind the exceptions to discharge for breach of fiduciary duty is punitive in nature and intended to discourage improper conduct, ensuring that relief intended for honest debtors does not inure to the benefit of the dishonest. *See generally In re St. Laurent,* 991 F.2d 672, 678–79 (11th Cir.1993); *Birmingham Trust Nat. Bank v. Case,* 755 F.2d 1474, 1477 (11th Cir.1985); *In re Hunter,* 771 F.2d 1126, 1130 (8th Cir. 1985). This intent would be easily frustrated if the debtor in this case were simply able to avoid the liability by allowing the surety to cover the debt and then discharging the debt to the surety in bankruptcy. *In re Norris,* 107 B.R. at 596. In concluding that the surety was subrogated to the nondischargeability rights of the debtor's former employer under § 523(a)(4), one court stated " 'the act should be liberally construed so as to prevent the discharge in bankruptcy of a liability which would not exist but for the fraudulent conduct of the bankrupt.... If there had been no embezzlement or misappropriation there would have been no loss to the surety and no occasion for indemnity.' " *In re Covino,* 12 B.R. 876 (Bankr.M.D.Fla.1981) (quot-

ing *Hartford Accident & Indemnity Co. v. Flanagan,* 28 F.Supp. 415, 419 (S.D.Ohio 1939)).

■ The debtor's reference to § 507(d), which addresses the priority of subrogated claims, is inapposite to the right of nondischargeability. *See In re Waite,* 698 F.2d 1177, 1178 (11th Cir.1983); *In re Norris,* 107 B.R. at 594; *In re Woerner,* 19 B.R. at 712. The debtor argues that § 507(d) is an example in the Code where a subrogee is not entitled to assert all of the rights of the party to whom he is subrogated. Under § 507(d), certain claims lose their priority when they are asserted by a subrogee, including unsecured wage claims, employee benefit claims, personal services, and tax claims. The debtor concludes from this priority exception that "[i]t stands to reason that if Congress denied priority of claims upon subrogation that surely it has denied subrogation for exemption of claims unless clearly expressed to the contrary." Def. Motion to Dismiss at 10. The court disagrees. The case law is clear that the right of nondischargeability is separate and distinct from the right of priority, a matter which does not affect the plaintiff's right to nondischargeability. *See In re Waite,* 698 F.2d at 1178.[3]

The debtor cites only one case which comes to a contrary conclusion concerning the subrogee's right to nondischargeability— the much criticized *National Collection Agency, Inc. v. Trahan,* 624 F.2d 906 (9th Cir.1980). *See In re Fields,* 926 F.2d at 504 n. 8 (criticizing *Trahan*); *In re Rose,* 139 B.R. at 881 (same); *In re Norris,* 107 B.R. at 595 (same); *In re Woerner,* 19 B.R. at 712 (same). In this pre-Code case, the court concluded that the debtor's tax surety would not be subrogated to the tax authority's right to nondischargeability. *Trahan,* 624 F.2d at 907. The court reasoned that a contrary conclusion would do nothing to promote the

collection of taxes but "would conflict with the federal bankruptcy policy favoring the discharge of debts." *Id.* The court further supported its holding by noting the new Code provision under § 507(d) restricting subrogees from asserting tax priority. *Id.* at 908 n. 4. *Trahan* is clearly distinguishable from this case. *Trahan* was decided before the enactment of the § 509, which explicitly provides for the right of subrogation rejected in *Trahan* as counter to bankruptcy policy. In *Trahan,* the court had to wrestle with the question of subrogation based on state created rights without any direction from federal Bankruptcy law. Now that the Code specifically provides for subrogation, there is no need to resort to state created rights and, accordingly, *Trahan* becomes irrelevant in such cases. *See In re Rose,* 139 B.R. at 881.

Accordingly, the court concludes that the subrogee is free to assert the creditor's nondischargeability rights under § 523(a)(4).

## C. *Nondischargeability under § 523(a)(4)*

■ Having concluded that the plaintiff, as surety, is subrogated to the rights of the trust beneficiaries and further concluded that the plaintiff is entitled to assert the trust beneficiaries' nondischargeability rights under § 523(a)(4), the court now turns to examine the trust beneficiaries' right to nondischargeability under § 523(a)(4). Specifically, the court must determine whether the plaintiff, standing in the shoes of the beneficiaries, is entitled to summary judgment on the question of whether the beneficiaries' claim is nondischargeable under § 523(a)(4).

### 1. *Events Leading to Default*

The relevant events leading up to the debtor's fiduciary default are as follows. The defendant was appointed trustee on February 4, 1985, by the Superior Court of the District of Columbia and ordered to sell cer-

---

**3.** The court further notes that the limitation of priority of subrogated claims under § 507(d) is a narrow exception to the general rule that the subrogee acquires *all* the rights of the prior claim holder. Evidence of this is that the § 507(d) exception applies to only four of the eight categories of priority claims. If this exception were intended to have the broad application suggested by the debtor, why would it specifically apply to only half of the priority claims? Moreover, if Congress' intent were as the debtor suggests—that subrogees' affirmative rights are limited to those clearly expressed in the Code—why is there any need for § 507(d)'s restriction in the first place? Under the debtor's logic, this section should instead provide that the other four priority claims *retain* their priority if asserted by a subrogee.

tain property and place the proceeds in a trust account for distribution to the beneficiaries. On October 30, 1987, the Superior Court issued an order authorizing the sale of the property for $70,000. The property was eventually sold on July 20, 1988.

The rules governing fiduciary responsibilities of court-appointed trustees in the District of Columbia are addressed under the District of Columbia Superior Court Civil Procedure Rules Section XIV, titled "Fiduciary Rules" ("Rules"). After the closing, under Rule 308(d),[4] the debtor, as trustee, was required promptly to file an accounting with the court and distribute the proceeds as directed by the court. Each one of the debtor's six accountings[5] reflected various withdrawals by the debtor from the trust account for operating costs and fees totalling in excess of $40,000.[6] The debtor made these withdrawals without prior court approval based on, he says, his understanding that under the rules of fiduciary accounting prior approval was not necessary, but that the payments were made subject to subsequent court approval. Richardson Dep. at p. 24. On May 15, 1990, the debtor filed a motion for approval of paid compensation and costs, totalling in excess of $46,000 and a petition to be discharged of his trustee obligations. On July 18, 1990, the court referred the debtor's motion and petition to an auditor-master for recommendation. In its order the court also directed the debtor to "maintain any proceeds not yet distributed and any monies taken for his own compensation, in an inter-est-bearing escrow account pending resolution of his accounts, Motion for Compensation and petition for discharge." Sup.Ct. of D.C. Order in C.A. No. 9310–83 (July 18, 1990). Interpreting this order to apply only to funds not yet distributed, the debtor deposited the remaining $1,500 in the trust account as reflected in the final accounting and retained the $38,546[7] he had already taken as compensation. Def. Dep. at pp. 47–49. The debtor also maintains that even if he had understood the order differently, he did not have the money to refund the trust account in any event. *Id.*

On January 15, 1993, the auditor-master submitted her report and recommendations to the Superior Court. In her report, the auditor-master concluded that the debtor's requested compensation was excessive and should be limited to the statutorily permitted amount, totalling $3,140.41. Report of Auditor–Master at pp. 13–14. Compensation to the trustee selling property, under Rule 308(e), is calculated as a percentage of the equity value of the property being sold and may be adjusted up or down by the court for "special cause."[8] General compensation for the trustee's services beyond those necessary to sell the property is not addressed under Rule 308. However, the auditor-master's report stated that the fiduciary fees provided under Rule 301(b), addressing compensation of conservators and guardians of infants, provided for reasonable compensation for similar services rendered by the debtor in this case. Report of Auditor–Master at p. 12. Rule

---

4. Rule 308(d) provides:

(d) *Account; distribution or proceeds.* Promptly after the settlement of a private or public sale made under this Rule a full and detailed account shall be filed and presented to the Court and the proceeds distributed as the Court may direct.

5. Each of the accountings was untimely under Rule 305(a) which potentially would have been grounds to remove him as a trustee under Rule 305(e).

6. A complete list of the over 30 withdrawals made by the debtor from the trust account during the period between June 11, 1985, and May 4, 1990, is provided in the Report of the Auditor–Master on pages 13 and 14.

7. The $38,546 figure is the amount mentioned in the debtor's deposition. The auditor-master's report reflects withdrawals of the debtor at the time of the order totalling $42,036.02. Report of Auditor–Master at pp. 13–14.

8. Rule 308(e) provides:

The compensation of the trustee or officer making a sale hereunder shall be 5 per cent on the 1st $3,000, plus two and one-half percent on the next $10,000, plus 1 percent on any amount in excess of $13,000 dollars of the value of the equity in the property being sold. In the event that the property is unencumbered by indebtedness, the compensation of the trustee or officer making the sale shall be computed and paid at the same rate upon the entire sales price. *The compensation may be increased or reduced by the Court for special cause shown in writing.* [Emphasis added.]

301(b) provides that the trustee's compensation for "ordinary services" [9] is not to exceed 5% of the amounts disbursed by the estate. At the discretion of the court, under Rule 301(f), the trustee is also entitled to compensation for "extraordinary services" rendered, which by definition must "be in addition to those services set forth in paragraph (b)" of Rule 301. The auditor master found that the debtor was entitled to $910.57 from the sale of the property under Rule 308(e) and $2,229.84 for ordinary services rendered under Rule 301(b), totalling $3,140.41, and further found that the debtor was not entitled to any extraordinary service compensation under Rule 301(f) or upward adjustment under Rule 308(e). Report of Auditor–Master at pp. 11–15. The auditor-master concluded that the debtor should reimburse the trust account for the funds the debtor had withdrawn from the account in excess of the amount he was entitled to.

On June 29, 1993, the Superior Court issued an order adopting the auditor-master's findings,[10] including the award of compensation to the debtor of $3,140.41, and ordered the debtor to reimburse the trust account for $58,315.83. Sup.Ct. of D.C. Order in C.A. No. 9310–83 (June 28, 1993). The debtor was removed as trustee and further ordered to submit proof of compliance with the directive to restore the $58,315.83 to the trust account by July 15, 1993. The debtor failed to comply with the order, providing only a bank statement showing the trust balance at $863.88 which reduced the amount owed to $57,451.95. On October 15, 1993, the court entered judgment against the debtor and the plaintiff "in the amount of $57,451.95 with interest running from June 28, 1993 and costs." The plaintiff satisfied the judgment on behalf of the debtor by paying $59,215.50 into the trust account and on January 21, 1994, received a corresponding judgment

against the debtor for $59,215.50 with interest running from the date of the judgment.

### 2. *Applicability of § 523(a)(4) to a Court–Appointed Trustee*

■ Section 523(a)(4) excepts from discharge "any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny...." The plaintiff's motion for summary judgment relies on the debtor's alleged defalcation in a fiduciary capacity. In order to establish nondischargeability as a matter of law, the plaintiff must prove (1) an express trust status to the property at issue; (2) the debtor was acting in a fiduciary capacity; and (3) that the debtor committed a defalcation while acting in that fiduciary capacity. *See In re Interstate Agency,* 760 F.2d 121, 124 (6th Cir. 1985); *In re Dauterman,* 156 B.R. 976, 980 (Bankr.N.D.Ohio 1993); *In re Kern,* 98 B.R. 321, 323 (Bankr.S.D.Ohio 1989).

As a court-appointed trustee responsible for the liquidation and distribution of trust assets, it is not disputed by the debtor that there was an express trust and that he had a fiduciary relationship with the trust beneficiaries. Such a conclusion is supported by the case law holding that state-created trust relationships are express trusts that establish a fiduciary relationship for purposes of § 523(a)(4). *See In re Martin,* 161 B.R. 672, 676 (9th Cir. BAP 1993) (court appointed guardian has fiduciary relationship with ward for purposes of § 523(a)(4)); *In re Baird,* 114 B.R. 198, 202 (9th Cir. BAP 1990) ("If state law creates an express or technical trust relationship between the debtor and another party and imposes trustee status upon the debtor, the debtor will be a fiduciary under § 523(a)(4)"); *In re Kern,* 98 B.R. at 323 (court appointed guardian of estate occupied position of fiduciary). Thus, the sole remain-

---

**9.** Rule 301(b) defines "ordinary services" as those normally performed by a fiduciary in administering such an estate and shall include, but not be limited to, the following:
    (1) Qualification as the fiduciary;
    (2) Collection of the ward's assets and income;
    (3) Payment of the ward's debts and costs of maintenance, as authorized or ratified by the Court;

    (4) General supervision of the ward's investments and policy relating thereto, including safekeeping; and
    (5) Preparation and filing of all inventories, accounts, and reports to the Court.

**10.** The auditor-master submitted a supplemental report addressing debtor's objections to the original report and clarifying certain minor items.

ing question for the court to determine is whether the debtor's unauthorized withdrawal of compensation from the trust and subsequent failure to reimburse the trust beneficiaries as ordered by the court rises to the level of defalcation and thus is nondischargeable.

### 3. *Violation of Legal Duty*

■ As an initial matter, the court addresses whether there was a legal duty requiring the debtor not to transfer funds to himself prior to approval of his compensation.

The debtor contends that his withdrawal of compensation from the trust account over the four years without prior court approval was a reasonable interpretation of the Rules. The obvious error in the debtor's argument concerning his interpretation of the Rules is that under Rule 305(c),[11] the trustee is required to get prior approval of all expenditures from the estate—meaning withdrawals of money—except those provided by statute. *See In re Conservatorship for Rich,* 337 A.2d 764, 766 (D.C.1975); *Rosendorf v. Toomey,* 349 A.2d 694, 702 (D.C.1975). Because compensation under Rule 308(e) can be reduced below the usual percentages, *see* n. 6 (language in emphasis), it follows that the debtor could not even argue that the compensation he is entitled to as the officer making the sale of the property is provided by statute, even assuming Rule 308(e) were a "statute" within the meaning of that term as used in Rule 305(c). Similarly, his claim under Rule 301 for services could only be made by asserting a claim in an annual accounting (see Rule 301(d)[12]), which would obviously be subject to later approval by the court. In any event, the only amounts withdrawn by the debtor that were disallowed were for upward adjust-

ments or extraordinary services. Both of these require prior notice to the court. *See* Rules 308(e)[13] and 301(f).[14] Accordingly, the debtor was clearly violating the fiduciary rules governing compensation by withdrawing the funds from the trust account without prior court approval.

### 4. *Is a Negligent Error of Law a Defalcation?*

■ The debtor contends that his acts resulted from mere negligence and thus do not rise to the level of defalcation. Specifically, the debtor argues that he was ignorant of the District of Columbia Rules regarding compensation of fiduciaries. The debtor contends that his ignorance of the law amounts to evidence of negligence and does not rise to the level of fraudulent intent necessary for defalcation. The court concludes that negligent ignorance of the law is not a defense to defalcation.

Neither the Code nor its legislative history provide a precise definition of defalcation. Thus, many courts looking at the question of defalcation begin by looking at the definition in Black's Law Dictionary, which provides:

> The act of a defaulter; misappropriation of trust funds or money in any fiduciary capacity; failure to properly account for such funds.

Black's Law Dictionary 504 (4th ed. 1968). The primary difficulty faced by the courts, of particular relevance in this case, is whether defalcation requires some sort of culpable conduct. The debtor has admitted to defaulting as a fiduciary by failing to refund the trust account for the withdrawal of excessive fees. The question is, however, whether the debtor's defense of negligence based on ignorance of the law is effective. Or, alternative-

---

**11.** Rule 305(c) provides in part:

> All expenditures from an estate by a fiduciary, except those provided by statute and court costs, shall be made only upon prior authorization of the court ...

**12.** Rule 301(d) provides:

> Time and method for claiming compensation for ordinary services. A claim for commission for ordinary services may only be made in an annual account and, except as otherwise provided in these rules, no statement of services is

required. The amount or percentage of commission claimed need only be reflected in the account itself.

**13.** *See* n. 8.

**14.** Rule 301(f) provides in relevant part:

> Compensation to fiduciary for extraordinary services. At the time of filing an annual account, a conservator or guardian may petition the Court for compensation for extraordinary services rendered....

ly, is the debtor guilty of defalcation based on the default without any showing of fraudulent intent? Summary judgment would be improper if a finding of fraudulent intent is necessary because the debtor's claim that there was only negligence and no intent to defraud would raise a genuine issue of fact.

The first court truly to wrestle with the issue of whether for a defalcation to exist it is necessary to find some level of fraudulent intent or culpable conduct was the Second Circuit in *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937).[15] Writing for the court, Judge Learned Hand declined to determine whether defalcation applied to an entirely innocent default, assuming instead, *arguendo,* that defalcation required some form of misconduct, citing a prior Second Circuit decision, *In re Bernard,*[16] where the court stated that "the misappropriation must be due to a known breach of the duty, and not to mere negligence or mistake."

In *Herbst,* on facts remarkably similar to our facts, the court found a defalcation where a court-appointed trustee spent fees awarded by the court without waiting for the appeal period to expire or inquiring as to the plaintiff's intent to appeal. When the fee award was subsequently overturned on appeal, the trustee was unable to reimburse the trust, having already spent the money. The *Herbst* court found the necessary level of misconduct by charging the debtor with the legal understanding that the fee award was potentially reversible and so should not have been spent until the appeals period had run. The court did not inquire as to the debtor's actual knowledge of his fiduciary responsibilities, stating that the debtor "knew, or if he did not know, he was charged with notice (having held himself out as competent to be an officer of the court).... " *Id.* at 512.

That a trustee is charged with the knowledge of the law and that only innocent mistaken knowledge of the facts will lead to dischargeability was confirmed by the Second Circuit's later decision in *In re Hammond,* 98 F.2d 703, 705 (2d Cir.), *cert. denied,* 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938):

> Implicit in [the debtor's] argument is the assumption that Hammond did not know, and is not chargeable with knowing, the rule of law forbidding him to take over for his own profit a contract of a solvent corporation, even when the corporation is financially unable to perform it. But this assumption is unwarranted; he is chargeable with knowledge of the law. The character of the liability imposed upon a fiduciary for appropriating property of his cestui in violation of his duty is the same whether he has actual knowledge that the law imposes the duty or is merely charged with such knowledge. In either event the appropriation is intentional and, since it is unlawful, it is such a "misappropriation" as, in our opinion, excepts the liability from release by a discharge in bankruptcy.

Subsequent cases have relied on *Herbst* and *Hammond* to specifically reject the argument that a defalcation will not stand where the default resulted from the trustee's ignorance of the law. *See In re Johnson,* 691 F.2d 249, 257 (6th Cir.1982) ("the objective fact that monies paid into the building contract fund were used for purposes other than to pay laborers, subcontractors or materialmen first is sufficient to constitute a defalcation"); *Carey Lumber v. Bell,* 615 F.2d 370, 375 (5th Cir.1980); *In re Baird,* 114 B.R. at 204 (defalcation found where court rejected debtor's interpretation of statute governing use of trust funds); *In re Gonzales,* 22 B.R. 58 (9th Cir. BAP 1982); *In re Kawczynski,* 442 F.Supp. 413, 417–18 (W.D.N.Y.1977) (defalcation found where diversion of trust funds for legitimate business expenses in technical violation of statute); *In re Levitt,* 18 B.R.

---

**15.** The case dealt with § 17(a)(4) of the former Bankruptcy Act of 1898, 11 U.S.C. § 35(a)(4), which was repealed and replaced in 1978 by 11 U.S.C. § 523(a)(4) of the Bankruptcy Code. The Code language is virtually identical, however, with the only difference being the omission of "misappropriation" from § 523(a)(4). Courts have held that this omission does not change the meaning of defalcation because defalcation is broader than misappropriation and, thus, must encompass it. *See In re Gans,* 75 B.R. 474, 488 (Bankr.S.D.N.Y.1987); *In re Kraus,* 37 B.R. 126, 131 n. 4 (Bankr.E.D.Mich.1984).

**16.** 87 F.2d 705, 707 (2d Cir.1937).

598, 602 (Bankr.E.D.Pa.1982) (defalcation found where debtor misapplied funds held by him as a fiduciary under the belief that he was authorized to do so); *but see In re Martin*, 161 B.R. at 678 (some bad faith necessary to find defalcation). In other words, ignorance of the law is no defense.

In establishing this objective standard for defalcation, the courts reason that such a standard "is consistent with the policy behind the bankruptcy laws of giving an honest debtor the opportunity for economic rehabilitation." *In re Johnson*, 691 F.2d at 256 (citations removed). The court went on to explain:

> This is because the requisite "badness," to conform with the spirit of the bankruptcy laws is supplied by an individual's special legal status with respect to another, with its attendant duties and high standards of dealing, and the act of breaching these duties ....
>
> Finally, measuring "defalcation" against an objective standard prevents ignorance of the law from becoming a defense to non-dischargeability and provides an incentive for individuals, such as Johnson, who are engaged in occupations subject to special statutes to apprise themselves of their obligations under the law.

*Id.* at 256–57.

The holdings in these cases, however, do not amount to a standard of defalcation *per se* for *any* failure to account for trust funds. There still may be a defense for "mere negligence or mistake of fact" when the trustee claims some sort of mistake of fact. The *Johnson* court qualified its holding with the statement that the debtor's use of funds would constitute a defalcation "so long as the use was not the result of mere negligence or a mistake of fact," echoing language in *In re Bernard*, but held it did not apply because

the only defense was that the debtor did not know that the law imposed the breached fiduciary duty upon him. *Id.* at 257. A similar qualification also appears in *Carey Lumber*, where the court notes the possible existence of a "rule that a mistake of fact may take a misappropriation out of the ambit of [defalcation]," but again holds that it does not apply to the facts. 615 F.2d at 375.

It is clear, however, based on the above discussion that the "mere negligence or mistake of fact" defense does *not* include ignorance of law, due to negligence or otherwise. In *In re Hammond*, the court stated that "the mistake ... referred to must be one as to a fact, not as to a rule of law with knowledge of which the bankrupt is chargeable." 98 F.2d at 705. Thus, an intentional unauthorized transfer of funds—as opposed to an innocent mistake or mere negligence— is a defalcation. *Quaif v. Johnson*, 4 F.3d 950, 955 (11th Cir.1993). As the court in *In re Johnson* opined, at a minimum trustees as officers of the court should be held responsible for knowledge of their fiduciary responsibilities. 691 F.2d at 256. Ignorance of the law should be no excuse to defalcation, whether due to negligence or not, where that ignorance leads to a fiduciary default.[17]

Applying the objective standard to this case, it is clear that the debtor is guilty of defalcation despite his claimed ignorance of the law. The Superior Court adopted the auditor-master's finding that the trustee had withdrawn excessive compensation from the trust account and that based on the Rules he was entitled to only $3,140.41. Accordingly, the court ordered the debtor to reimburse the trust account for the $58,315.83 arrearage. The debtor concedes that he failed to account for the funds and thus breached his fiduciary responsibilities. The debtor has

---

**17.** The court in *In re Martin*, 161 B.R. at 678, concluded that some form of bad faith must be found for there to be a defalcation. In *Martin*, the guardian failed to register the trust asset, a mobile home, in his own name rather than in the ward's name, resulting in the unauthorized sale of the mobile home by a third party who procured the ward's signature. Finding no evidence of bad faith, the court concluded the guardian's default, merely a failure to use ordinary care, was not a defalcation.

The *Martin* court fails to address the distinction between a mistake of fact and a mistake of law. Accordingly, it warrants little weight in the court's analysis. In any event, *Martin* is arguably distinguishable because no legal duty beyond safeguarding the estate's assets in a prudent manner was at stake. The failure affirmatively to use ordinary care is vastly different from an affirmative knowing act that violates a legal prohibition against withdrawing funds without court authorization.

claimed no mistake of fact. The debtor contends only that his ignorance of District of Columbia law should preclude a finding of defalcation. As the court concluded above, the debtor's defense of negligent ignorance of the law is ineffective against defalcation. The debtor will be charged with knowledge of the rules governing fiduciaries.

### 5. Defense that the Debtor's Estimate was Reasonable

The debtor's next defense is his argument that the District of Columbia law on the issue of compensation was unclear. Therefore, he contends that even if he is charged with knowledge of the law, his estimate of appropriate compensation was a reasonable interpretation of the rules and thus not a defalcation. But however reasonable the debtor's calculation of compensation was, he violated the law in withdrawing the compensation before it was fixed by the court. That act constituted a defalcation for reasons explained above.

### 6. Alleged Errors in Superior Court Ruling

■ The debtor's remaining argument is that the Superior Court's fee determination, which the debtor has appealed, was in error based on the provisions for compensation under Rules 301(f) and 308(e).

The Superior Court clearly determined that the trustee took excessive compensation and was statutorily entitled to only $3,140.41. Under the doctrine of *res judicata,* the court will not reexamine the question of whether the debtor's compensation was or was not excessive. This adversary proceeding is one to determine whether the adjudicated debt is nondischargeable, not to revisit the Superior Court's determination of the amount of debt. The debtor's argument goes to the amount of liability, not the nondischargeability of that liability.

Accordingly, the court will grant summary judgment in favor of the plaintiff on the question of whether the debtor is guilty of a defalcation under § 523(a)(4).

### D. Interest and Administrative Expenses

■ Finally, the debtor also raises the argument that certain disallowed administrative expense claims of others paid with the funds and surcharged interest should not be included as part of the nondischargeable debt. The court rejects both of these arguments.

Regarding the disallowed administrative expenses, the debtor argues that because he paid these funds to third parties and not himself, the resulting debt should be nondischargeable. Whether the improperly withdrawn funds went to the debtor or third parties does not change the character of the defalcation. The debtor may have a claim against the persons who were paid the disallowed claims. But that does not go to the nondischargeable character of his liability for withdrawing the funds in the first place. Accordingly, the fact that funds were withdrawn to pay disallowed administrative expenses does not affect the court's finding in this case.

■ The debtor has also objected to nondischargeability of the "surcharged interest on the debt." Def. Pre-trial Statement at 4. The court is unclear whether the debtor is referring to the interest awarded to the trust beneficiaries and paid by the plaintiff or the interest subsequently awarded to the plaintiff running from the date of judgment against the debtor. A clarification is not necessary, however, because a nondischargeable debt under § 523(a) encompasses all interest awarded on the debt. This court has rejected arguments to the contrary, holding that the plain language of § 523(a) mandates that the entire debt is dischargeable, including interest. *See In re Hecker,* 95 B.R. 1 (Bankr.D.D.C.1989). This holding is consistent with decisions of other courts. *In re Jordan,* 927 F.2d 221, 228 (5th Cir.1991); *In re Romero,* 535 F.2d 618, 623 (10th Cir.1976); *In re Steinbrunner,* 149 B.R. 484, 489 (Bankr.N.D.Ohio 1992). *See In re St. Laurent,* 991 F.2d at 678 (debt includes punitive damages in addition to compensatory award).

Accordingly, the court concludes that the nondischargeable debt owed to the plaintiff includes all expenses and accrued interest.

## CONCLUSION

In accordance with this decision, a judgment will be entered granting the plaintiff's motion for summary judgment.